## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF RHODE ISLAND

In re

**BLB WORLDWIDE HOLDINGS, INC.,**
**n/k/a TWIN RIVER WORLDWIDE**
**HOLDINGS, INC.,**

**Chapter 11**
**Case No. 09-12420**

**Debtor**

**TWIN RIVER WORLDWIDE HOLDINGS,**
**INC.,**

**Adversary Proceeding**
**No. 15-1003**

**Plaintiff**

**v.**

**SOLA LTD; ULTRA MASTER FUND LTD;**
**WINGSPAN MASTER FUND, LP; and**
**APOLLO TWIN RIVER HOLDINGS, L.P.,**

**Defendants**

### MEMORANDUM OF DECISION

**I.    Overview and Procedural History**

On June 23, 2009, UTGR, Inc. d/b/a Twin River, BLB Worldwide Holdings, Inc., and BLB

Management Services, Inc. (collectively, "Twin River") each filed petitions for relief under chapter 11 of

the Bankruptcy Code.  After first day hearings, the Court granted Twin River's motion to jointly

administer the three cases.  On January 26, 2010, Twin River filed its Second Amended Joint Plan of

Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan").  On June 23, 2010, the

Court held a confirmation hearing (the "Confirmation Hearing), and on June 24, 2010, the Court issued

an order confirming the Plan (the "Confirmation Order").  The Plan provided that the holders of Twin

River's first-priority secured debt (the "First Lienholders," or later the "Shareholders") would receive

100% of the equity of the reorganized company and $300 million in new first lien debt (the "New First

Lien Loan").  The Plan also provided that the holders of Twin River's second-priority secured debt (the

"Second Lienholders," or later the "CVR Holders") would receive, in exchange for their second lien

claims, certain Contingent Value Rights ("CVRs") which would entitle the holders thereof to a recovery in

the event that certain conditions were met.  The Confirmation Order contemplated the execution of a

further document governing the CVRs, which would be valid, binding, and enforceable without further

action from the Court.   On or around November 5, 2010, Twin River and the Second Lienholders

executed an agreement (the "CVR Agreement").  The Plan became effective on November 5, 2010.  The

jointly administered cases were later closed.

On November 17, 2014, Twin River moved to reopen the three chapter 11 cases "for the limited

purpose of clarifying the Confirmation Order with respect to the rights afforded to [the CVR Holders]."

Also, on November 17, 2014, Twin River filed a Motion for Clarification of Confirmation Order, which

requested that the Court issue an order clarifying the Confirmation Order to specify that "the CVR

Agreement's provisions regarding how to calculate the payment thresholds above which CVR holders

are entitled to proceeds from a covered transaction is a permissible implementation of the Plan's

general framework for the CVRs."  The Motion for Clarification further requested that "the Court clarify

its Confirmation Order to specify that the CVR Agreement's threshold is permissible and in force."  On

December 10, 2014, multiple Shareholders filed objections.  These Shareholders were Sola Ltd. and Ultra

Master Ltd. (collectively, "Solus"), Apollo Twin River Holdings, L.P. ("Apollo"), and Wingspan Master

Fund, LP ("Wingspan").  Solus and Apollo had had been First Lienholders prior to the effective date of

the Plan. [1]  Wingspan had not been a First Lienholder but acquired its equity position either from a party

that had been a First Lienholder or from a successor to a First Lienholder.  After a hearing held on

---

[1] Solus was also a Second Lienholder prior to the effective date of the Plan as it held both first lien debt and second lien debt.

January 7, 2015, the Court granted the Motion to Reopen and denied the Motion for Clarification without prejudice to Twin River filing an adversary complaint seeking the same relief.

On January 21, 2015, Twin River filed an adversary complaint (the "Complaint") requesting "an order instructing that the provision of the CVR Agreement setting forth additional details regarding the thresholds above which CVR holders are entitled to part of the proceeds from a covered transaction is a permissible implementation of [the Plan] approved by the Court in [the Confirmation Order]."  The Complaint named Solus, Apollo, and Wingspan (collectively, the "Defendants") as defendants.  On February 6, 2015, the Defendants moved to join the CVR Holders[2] as plaintiffs, which motion the Court allowed, thus joining Twin River and the CVR Holders (collectively, the "Plaintiffs") as party plaintiffs.  On March 9, 2015, the Defendants filed answers to the Complaint.  On June 8, 2015, the Plaintiffs filed a motion for summary judgment.  On June 26, 2015, the Defendants filed a cross motion for summary judgment.  The Court heard oral argument on the cross motions for summary judgment on August 6, 2015 and August 10, 2015, totaling over eight hours of argument.  For the reasons set forth below, the Plaintiffs' motion for summary judgment is granted and the Defendants' motion for summary judgment is denied.

---

[2] The CVR Holders are Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"), the Sankaty Entities, the Neuberger Funds (the "NB Funds"), the Eaton Vance Entities (the "Eaton Vance Entities"), and the Delaware Street Entities (the "DSC Entities"). The Sankaty Entities are certain funds, accounts and/or other entities managed or advised by Sankaty Advisors, LLC and include: Avery Point CLO, LTD, Castle Hill III CLO, Limited, Castle Hill I-INGOTS, Ltd., Chatham Light II CLO, Limited, Katonah III, Ltd., Katonah IV, Ltd., Prospect Harbor Designated Investments, L.P., Race Point II CLO, Limited, Race Point III CLO, Race Point IV CLO, Ltd., Sankaty Credit Opportunities (Offshore Master) IV, L.P., Sankaty Credit Opportunities II, L.P., Sankaty Credit Opportunities III, L.P., Sankaty Credit Opportunities IV, L.P., Sankaty High Yield Asset Grantor Trust, Sankaty High Yield Partners II Grantor Trust, Sankaty Special Situations I Grantor Trust, and SR Group, LLC. The NB Funds are NB Distressed Debt Investment Fund Limited and NB Distressed Debt Master Fund LP. The Eaton Vance Entities are Eaton Vance Management, Eaton Vance Trust Company, and Boston Management and Research. The DSC Entities are BCB Consultants, LLC, CLAM Partners, LLC, Delaware Street Capital, L.P., and WHP Partners.

II.    **Findings of Fact**

Except as otherwise indicated, the following facts are established and uncontroverted.

1.    Twin River owned and operated a casino in Rhode Island that began to experience financial distress in early 2008.[3]

2.    Twin River's primary creditor constituencies were its two classes of secured lenders: the First Lienholders, holders of first lien pre-petition debt, with allowed claims of approximately $442 million, and the Second Lienholders, holders of second lien pre-petition debt, with allowed claims of approximately $155 million, in each case as of the petition date.[4]

3.    The First Lienholders and the Second Lienholders were parties to an intercreditor agreement (the "Intercreditor Agreement").  Under the Intercreditor Agreement, the Second Lienholders were entitled to recover on account of their second lien claims only after the First Lienholders had received full satisfaction of all obligations due and owing to them under the first lien claims.[5]

4.    Prior to Twin River's bankruptcy filing, Twin River and its major stakeholders – including representatives of Twin River, the First Lienholders, the Second Lienholders, equity sponsors, and the State of Rhode Island – commenced discussions regarding a potential restructuring.[6]

5.    The First Lienholders were represented in these discussions by Merrill Lynch Capital Corporation[7], the administrative agent under the First Lienholders' credit agreement with Twin River (the "First Lien Agent").[8]  The Defendants allege that this is a disputed fact.[9]  However, the Defendants

---

[3] Local Rule 56(a) Statement of Undisputed Facts in Support of the Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Facts"), Docket No. 147 at ¶ 1.

[4] *Id.* at ¶ 2.

[5] *Id.* at ¶¶ 27-28.

[6] *Id.* at ¶ 3.

[7] Despite the similarities in name, this entity is separate and distinct from the CVR Holder, Merrill Lynch, Pierce, Fenner & Smith Incorporated.

[8] Plaintiffs' Facts, Docket No. 147 at ¶ 13.

[9] Defendants' Rule 56(A) Statement of Disputed Facts, Docket No. 181-2 at ¶ 13.

concede that the credit agreement between the First Lienholders' and Twin River provided that the First

Lien Agent would serve as the administrative agent for the First Lienholders.[10]  Further, the Defendants

do not allege nor do they provide any evidence that the First Lien Agent lacked at least apparent

authority to negotiate on behalf of the First Lienholders.  Accordingly, I find that there is no genuine

dispute as to whether the First Lien Agent acted with authority as the agent of the First Lienholders.

6.        The First Lien Agent hired Cadwalader, Wickersham & Taft LLP as its counsel ("First Lien

Agent Counsel") and Capstone Advisory Group as its financial advisor ("First Lien Agent Financial

Advisor").[11]

7.        The First Lien Agent facilitated the negotiations and, along with the First Lien Agent

Counsel and the First Lien Agent Financial Advisor, periodically updated both the steering committee of

First Lienholders ("First Lien Steering Committee") and the entire group of First Lienholders.[12]  As will be

discussed below, the parties dispute the extent of the information conveyed by the First Lien Agent to

the First Lienholders.  However, as further explained below, I conclude that there is no genuine issue of

material fact in this regard.

8.        In June 2009, shortly before Twin River filed for bankruptcy, these negotiations resulted

in a restructuring agreement that set forth the principal terms for the restructuring of Twin River (the

"Restructuring Agreement").[13]  The Restructuring Agreement was agreed to by the First Lien Steering

Committee (led by the First Lien Agent and its professionals), substantial holders of Twin River's second

lien debt, and the State of Rhode Island.[14]

---

[10] *Id.*
[11] Plaintiffs' Facts, Docket No. 147 at ¶ 14.
[12] Statement of Undisputed Facts Pursuant to Local Rule 56(a) in Support of Defendants' Motion for Summary Judgment ("Defendants' Facts"), Docket No. 205 at ¶ 3.
[13] Plaintiffs' Facts, Docket No. 147 at ¶ 6.
[14] *Id.* at ¶ 7.

9. The Restructuring Agreement provided that the First Lienholders' secured claims were to be exchanged for 100% of the common equity of the reorganized company plus the New First Lien Loan in the amount of $300 million.[15]

10. The negotiating parties initially contemplated that the Second Lienholders would receive equity and/or warrants on account of their claims.[16] The parties later agreed, in light of certain regulatory and licensing requirements associated with ownership of equity in a casino, that the consideration to the Second Lienholders should instead be structured as Contingent Value Rights. [17]

11. The Restructuring Agreement provided that the Second Lienholders:

shall be entitled, in the event of a sale of the facility or a recapitalization of the reorganized Company (such event, a "Transaction"), to (i) 50% of the amount of Transaction proceeds between $475,000,000 and $575,000,000 and (ii) 75% of the amount of Transaction proceeds exceeding $575,000,000.[18]

12. $475,000,000 is approximately equal to the amount of the First Lienholders' claim, as of the petition date, plus an additional 8%.

13. The Restructuring Agreement does not explicitly address the question of whether payments and distributions to the First Lienholders, such as repayments of the New First Lien Loan or dividend payments, count toward the payment thresholds after which the Second Lienholders are entitled to a recovery. However, the negotiating parties, including the First Lien Agent, agreed at the time of the Restructuring Agreement, that the First Lienholders would receive all of the equity in the reorganized company, but would share any upside recoveries with the Second Lienholders, upon the occurrence of a monetizing event such as a sale or a recapitalization, once the First Lienholders were able to recover par plus a "a little bit extra"[19] (approximately 8%) on their pre-petition claims by any

---

[15] *Id.* at ¶ 8.
[16] *Id.* at ¶ 11.
[17] *Id.* at ¶ 12.
[18] *Id.* at ¶ 10.
[19] Greenburg Deposition, Coyle Ex. 1, Docket No. 148-2 at 33: 15-21.

means of repayment.  In other words, the negotiating parties agreed that additional payments and

distributions to the First Lienholders *would count* toward the payment thresholds so that the Second

Lienholders would be entitled to share in the recovery upon the occurrence of a sale or recapitalization

that, *when combined with earlier payments and distributions*, resulted in the First Lienholders

recovering the full value of their claim plus a small amount more.

The Defendants hotly contest the issue of the parties' intent with respect to the effect of

additional payments and distributions to the First Lienholders on the payment thresholds.  However, as

will be discussed in more detail in the Discussion section, the unequivocal evidence demonstrates that

there is no genuine dispute as to this issue.

14.      On June 23, 2009, the bankruptcy petitions were filed.

15.      On December 15, 2009, Twin River filed its Joint Plan of Reorganization (the "First

Plan"), together with a plan supplement that included the Restructuring Agreement.  The First Plan

described the second lien recovery using substantially the same language found in the Restructuring

Agreement.[20]

16.      On January 22, 2010, Twin River filed an amended plan, followed shortly by the Second

Amended Plan of Reorganization (*i.e.* the "Plan") which was filed on January 26, 2010.[21]

17.      In early March 2010, Twin River filed a valuation analysis completed by Twin River's

financial advisor, Lazard Frères & Co. LLC ("Lazard"), that estimated that the reorganized value of Twin

River was between $341 million and $404 million, with a midpoint of $373 million.[22]

---

[20] Plaintiffs' Facts, Docket No. 147 at ¶ 25.
[21] *Id.* at ¶ 30.
[22] Whiting Declaration, Tecce Exhibit 35, Docket No. 179-35.

18.    The Plan was voted on and the results were filed on March 9, 2010, with 94.96% of the

First Lienholders voting in favor (132-7, 95.61% of the claim amount), and 88.06% of the Second

Lienholders voting in favor (59-8, 94.35% of the claim amount).[23]

19.    Under the Plan, the First Lienholders received 100% of the reorganized company's new

equity and the $300 million New First Lien Loan.[24]

20.    Under the Plan, the unsecured creditors received a recovery equal to 65% of the

allowed amount of their unsecured claims.[25]

21.    Under the Plan, the Second Lienholders received CVRs, which were described as follows:

For a period of seven (7) years following the Effective Date, the Holders of Second Lien
Facility Claims, in the event of a sale or recapitalization of the Reorganized Debtors
(such event, a "Transaction"), shall be entitled to (i) 50% of the amount of Transaction
proceeds between $475,000,000 and $575,000,000, and (ii) 75% of the amount of
Transaction proceeds exceeding $575,000,000.[26]

22.    The Plan does not explicitly address the question of whether payments and distributions

to the First Lienholders, such as repayments of the New First Lien Loan or dividend payments, count

toward the payment thresholds after which the Second Lienholders are entitled to share in the recovery.

However, the negotiating parties, including the First Lien Agent, were in agreement at the time the Plan

was filed that the First Lienholders would receive all of the equity in the reorganized company, but

would start sharing any upside recoveries with the Second Lienholders, upon the occurrence of a

monetizing event such as a sale or a recapitalization, once the First Lienholders were able to recover par

plus a small "tip"[27] (approximately 8%) on their pre-petition claims by any means of repayment.  In other

words, the negotiating parties agreed that additional payments and distributions to the First Lienholders

*would count* toward the payment thresholds so that the Second Lienholders would be entitled to share

---

[23] Plaintiffs' Facts, Docket No. 147 at ¶ 31.
[24] *Id.* at ¶ 33.
[25] Plan at 17.
[26] Plaintiffs' Facts, Docket No. 147 at ¶ 34.
[27] Greenburg Deposition, Coyle, Ex. 1, Docket No. 148-2 at 87:25-88:7, 88:22-89:2.

in the recovery upon the occurrence of a sale or recapitalization that, *when combined with earlier payments and distributions*, resulted in the First Lienholders recovering the full value of their claim plus a small amount more.

The Defendants hotly contest the issue of the parties' intent with respect to the effect of additional payments and distributions to the First Lienholders on the payment thresholds.  However, as will be discussed in more detail in the Discussion section, the unequivocal evidence demonstrates that there is no genuine dispute as to this issue.

23.    The purpose of the CVRs was to give the Second Lienholders some value in exchange for giving up their $155 million pre-petition claim entirely, avoiding costly bankruptcy litigation, and still allowing the unsecured creditors to recover 65 cents on the dollar.[28]

24.    All of the negotiating parties understood that Twin River and the Second Lienholders would enter into a separate agreement regarding the CVRs.[29]

25.    In or about April 2010, the First Lien Agent Counsel prepared the initial draft of the CVR Agreement.[30]  I linger here to emphasize this undisputed finding: it was the First Lien Agent Counsel that initially drafted the CVR Agreement upon which the Second Lienholders now rely.

26.    In or about April 2010, the First Lien Agent's professionals exchanged multiple e-mails containing drafts of the CVR Agreement.[31]  It is evident from this correspondence *on the First Lienholder side of the negotiations* that the understanding of the negotiating parties was that payments and distributions to the First Lienholders count toward the payment thresholds after which the Second Lienholders will be entitled to a recovery.

---

[28] Plaintiffs' Facts, Docket No. 147 at ¶ 39.
[29] *Id.* at ¶ 41.
[30] Defendants' Facts, Docket No. 205 at ¶ 32.
[31] April 14, 2010 E-mail from Peter Nurge, Coyle, Ex. 21, Docket No. 148-21; April 26, 2010 E-mail form David Silverman, Coyle Ex. 23, Docket No. 148-23; April 27, 2010 E-mail from David Silverman, Docket No. 148-24.

27.     A draft of the CVR Agreement was circulated to representatives of the Second

Lienholders in or around May 2010.[32]  As the Confirmation Hearing approached, as set out in more detail

below, additional drafts were circulated between the First Lien Agent professionals and the

representatives of the Second Lienholders in or around June 2010.[33]  As is indicated in the

correspondence between the representatives of the Second Lienholders and the First Lien Agent

professionals, the negotiating parties were in agreement that payments and distributions to the First

Lienholders count toward the payment thresholds after which the Second Lienholders would be entitled

to share in the recovery.

28.     The Confirmation Hearing took place on June 23, 2010.  At the Confirmation Hearing,

Judge Henry Boroff, the presiding judge, specifically addressed the CVR Agreement, asking "what is that

instrument, agreements, or documents that are going to be given to [the Second Lienholders]?"[34]  In

response, counsel for Twin River stated, "[t]here is a -- there is a document that is called a contingent

value right.  It might be called a contingent value right agreement."[35]  Counsel explained that the CVR

Agreement "incorporates at much greater length exactly how the operation of the contingent value

right works and what everyone's rights and obligations and enforcement under that document are."[36]

No party expressed disagreement with this characterization of the CVR Agreement.  The Court entered

the Confirmation Order on June 24, 2010.

29.     The Confirmation Order specifically requires the Second Lienholders to execute an

agreement governing the CVRs before they would be entitled to any distribution under the Plan.[37]  The

Confirmation Order provides that such agreement shall not "be inconsistent with the terms of the

---

[32] May 27, 2010 E-mail from Michael Cohen, Coyle Ex. 80, Docket No. 199-7.
[33] June 3, 2010 E-mail from Michael Cohen, Coyle Ex. 70, Docket No. 148-70; June 7, 2010 E-mail from David Silverman, Docket No. 148-71.
[34] Confirmation Hearing Tr. at 57: 18-19.
[35] *Id.* at 57: 22-24.
[36] *Id.* at 58: 2-4.
[37] Confirmation Order at ¶ 103.

Plan."[38]  Further, the Confirmation Order provides that such agreement shall be valid, binding, and

enforceable without further action from the Court.[39]

30.     Following the Confirmation Hearing, an execution version of the CVR Agreement was

circulated to all the Second Lienholders, including Defendant Solus which held both first and second lien

debt.  The Second Lienholders, including Solus, signed the CVR Agreement.  The execution version of the

CVR Agreement was dated November 5, 2010.

31.     The effective date of the Plan was November 5, 2010.

32.     The CVR Agreement provides that the CVR Holders will receive payment on their CVRs

only in the event there is a qualifying "payment event" such as a sale or recapitalization.[40]  The CVR

Agreement also explicitly defines the two thresholds after which the CVR Holders are entitled to a

distribution.  The threshold definitions make clear that any distributions by way of loan repayments or

dividend payments to the First Lienholders / Shareholders will count toward the payment thresholds.

The first threshold, after which the CVR Holders are entitled to share 50% of the proceeds, is defined as

follows:

> "First Minimum Proceeds Threshold" means (i) $475,000,000 minus (ii) the sum of (x)
> the aggregate amount of all cash dividends or distributions made, at any time from and
> after the Distribution Date, in respect of any equity securities of any member of the
> Company Group or the obligations of any member of the Company Group with respect
> to the repayment of the principal amounts under the Senior Secured Credit Agreement
> plus (y) the aggregate Fair Market Value of any non-cash dividends or other distributions
> made, at any time from and after the Distribution Date, in respect of any equity
> securities of any member of the Company Group or the obligations of any member of
> the Company Group with respect to the repayment of the principal amounts under the
> Senior Secured Credit Agreement.[41]

The second threshold, after which the CVR Holders are entitled to share 75% of the proceeds, is

defined as follows:

---

[38] *Id.*
[39] *Id.* at ¶ 71.
[40] CVR Agreement at 3 (defining "CVR Payment Event").
[41] *Id.* at 4 (defining "First Minimum Proceeds Threshold").

"Second Minimum Proceeds Threshold" means (i) $575,000,000 minus (ii) the sum of (x)
the aggregate amount of all cash dividends or distributions made, at any time from and
after the Distribution Date, in respect of any equity securities of any member of the
Company Group or the obligations of any member of the Company Group with respect
to the repayment of the principal amounts under the Senior Secured Credit Agreement
plus (y) the aggregate Fair Market Value of any non-cash dividends or other distributions
made, at any time from and after the Distribution Date, in respect of any equity
securities of any member of the Company Group or the obligations of any member of
the Company Group with respect to the repayment of the principal amounts under the
Senior Secured Credit Agreement.[42]

In effect, the CVR Agreement provides that the Second Lienholders / CVR Holders begin to share

in the recovery upon the occurrence of a qualifying payment event such as a sale or recapitalization

that, *when combined with any earlier payments or distributions*, results in the First Lien Holders /

Shareholders recovering in excess of the payment thresholds.

33.     The CVR Agreement's payment threshold provisions are consistent with the parties'

bargained-for intended meaning of the Plan.

34.     In May 2013, Twin River entered into a new $220 million credit facility and used the

proceeds from that facility to complete repayment of the $300 million New First Lien Loan.[43]  In the

fourth quarter of 2013, Twin River paid special dividends of approximately $50 million to the First

Lienholders / Shareholders in respect of their equity holdings of the reorganized company.[44]

Accordingly, it is undisputed that the First Lienholders / Shareholders have received distributions of no

less than $350 million since Twin River's emergence from bankruptcy.

## III.    Jurisdiction

The matter before the Court is a proceeding in which the Plaintiffs seek declaratory relief in

regard to an order issued by the Court confirming a chapter 11 plan of reorganization.  When the Court

issued the Confirmation Order, it retained jurisdiction to "[h]ear and determine disputes arising in

---

[42] *Id.* at 6 (defining "Second Minimum Proceeds Threshold").
[43] Plaintiffs' Facts, Docket No. 147 at ¶ 60.
[44] *Id.* ¶ 61.

connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation

Order, including disputes arising under agreements, documents or instruments executed in connection

with the Plan[.]"[45]  This matter arises in a bankruptcy case and under the Bankruptcy Code, and

therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing

order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(1) and (b)(2).  Accordingly, the Court has authority

to enter a final order.

IV.    **Positions of the Parties**

    A.    **The Plaintiffs**

By the Complaint, the Plaintiffs have requested "an order instructing that the provision of the

CVR Agreement setting forth additional details regarding the thresholds above which CVR holders are

entitled to part of the proceeds from a covered transaction is a permissible implementation of [the Plan]

approved by the Court in [the Confirmation Order]."  The Plaintiffs offer four arguments explaining why

they are entitled to summary judgment.

First, the Plaintiffs argue that the Plan is unambiguous and consistent with the CVR Agreement.

The Plaintiffs argue that when considering the context of the Plan, the situation in which the Plan was

agreed, and the clear purpose of the CVRs, the Plan unambiguously provides that the CVR Holders begin

to share in the value of reorganized Twin River once the First Lienholders are made whole on their pre-

petition claims.  The Plaintiffs concede that such a reading requires an examination of some additional

materials beyond merely the text of the Plan itself in order to put the agreement in context.  For that

context, they point to the Disclosure Statement, the Confirmation Order, and the transcript of the

Confirmation Hearing.

---

[45] Plan at 44.

Second, the Plaintiffs argue, citing applicable case law, that the Court must avoid any interpretation of the Plan that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.  The Plaintiffs further argue that the Defendants' interpretation of the Plan is plainly absurd, economically irrational, and would result in a massive windfall to the former First Lienholders, now the Shareholders.  Under the Defendants' interpretation, the payment thresholds after which the CVR Holders are entitled to a distribution will not be reduced by loan repayments or dividends paid to the Shareholders.  Under such an interpretation, only a single transaction in the amount of $475 million or more would trigger a requirement to share with the CVR Holders, meaning that, if properly structured to their benefit, the Shareholders could receive a potentially unlimited recovery before ever having to share with the CVR Holders.  The Plaintiffs argue that such an interpretation, when viewed within the context in which the parties were negotiating, is plainly absurd.

Third, the Plaintiffs argue that, to the extent there is any ambiguity in the Plan, the extrinsic evidence demonstrates that there is no dispute as to what the parties intended.  The Plaintiffs concede that granting summary judgment in the context of an ambiguous plan is only appropriate where the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation.  However, the Plaintiffs argue that the extrinsic evidence in the instant case is just the type of overwhelmingly one-sided evidence this stringent standard requires.  The Plaintiffs note that the testimony and sworn statements from those who were involved with negotiating the Restructuring Agreement and the Plan is unequivocal: the agreement was that the Second Lienholders would be provided an opportunity to share in the upside of a Twin River reorganization once the First Lienholders recovered their claim.  This common understanding among the negotiating parties of the deal embodied in the Plan is exactly what the CVR Agreement accomplishes.  The Plaintiffs further cite to numerous contemporaneous documents to support their assertion that at all relevant stages of negotiation, the

parties on both sides of the negotiations intended for the Second Lienholders to share in the upside of

the restructured company once the First Lienholders were made whole on their pre-petition claims

regardless of the source of repayment.  Further, the Plaintiffs note that the Defendants are unable to

produce *any* extrinsic evidence to create a genuine dispute as to the intent of the parties.  Accordingly,

the Plaintiffs argue that no reasonable factfinder could decide contrary to the Plaintiffs' interpretation

that the parties intended the Plan to be consistent with the payment threshold provisions contained in

the CVR Agreement.

Finally, the Plaintiffs argue that the Defendants' conduct prevents them from challenging the

validity of the CVR Agreement.  In support of this argument, the Plaintiffs assert that: (i) Solus, which

had been both a First Lienholder and a Second Lienholder, signed the CVR Agreement in 2010 and

signed and ratified it again in 2014, (ii) both Solus and Apollo acquiesced to the CVR Agreement through

their conduct over the last five years, and (iii) Wingspan was well aware of the CVR Agreement when it

acquired its position in Twin River.  According to the Plaintiffs, each of the three Defendants should be

equitably estopped from challenging the validity of the CVR Agreement due to their past conduct.

**B.      The Defendants**

The Defendants offer several arguments in support of summary judgment in their favor.  First,

focusing on the Plan's definition of the term, "Transaction," the Defendants argue that the Plan is

unambiguous and inconsistent with the CVR Agreement.  The Plan provides that the CVR Holders will be

entitled to a percentage of the proceeds of a "Transaction," which, according to the Defendants, is

exclusively defined as a "sale or recapitalization."  Accordingly, the Defendants argue that only the

proceeds from a sale or recapitalization count toward the payment thresholds after which the CVR

Holders are entitled to share in a distribution.  To the extent the CVR Agreement broadens the

circumstances under which the CVR Holders are entitled to a distribution, it is inconsistent with the Plan

and therefore unenforceable.  The Defendants note that if the parties had intended for debt repayments

15

or dividends to count toward the relevant thresholds, they could have easily and plainly said so in the Plan.  According to the Defendants, the Plan is unambiguous and the parties' subjective intent is irrelevant.

Second, the Defendants argue that the CVR Agreement constituted a post-confirmation (and pre-consummation) modification of the Plan that was not enacted in compliance with the requirements of section 1127 of the Bankruptcy Code.  11 U.S.C. § 1127.  The Defendants argue that the CVR Agreement altered the fundamental economics of the Plan by redefining the term "Transaction" to change the event triggers and monetary thresholds covering the CVR Holders' entitlement to distributions.  Those changes benefit the CVR Holders to the material detriment of the Shareholders, most notably by reducing the monetary thresholds by $350 million through the repayment of the New First Lien Loan ($300 million) and dividends distributed to date ($50 million).  According to the Defendants, modifying the Plan in this manner required compliance with the requirements of section 1127, including the solicitation and disclosure requirements of section 1125.  11 U.S.C. §§ 1127 and 1125.  Because the CVR Agreement was not enacted in compliance with these requirements, it is void, illegal, and unenforceable, to the extent that it modified the Plan.  The Defendants also note that Defendant Solus could not have ratified the CVR Agreement, as the Plaintiffs contend, because an agreement that is legally void cannot be ratified.

Finally, the Defendants argue that the Plaintiffs failed to avail themselves of multiple opportunities to properly amend the Plan and did not adequately disclose the contents of the CVR Agreement despite having ample opportunity to do so.

V.      **Discussion**

A.      **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), made applicable by Fed. R. Bankr. P. 7056.  "A 'genuine' issue is one supported by such evidence that a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (*internal citations omitted*).  A "material" fact is one that has "the potential to change the outcome of the suit under the governing law" if the dispute is resolved in favor of the nonmoving party.  *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 314-15 (1st Cir. 1995).  In dealing with cross-motions for summary judgment, a court "must consider each motion separately, drawing inferences against each movant in turn."  *Blackie v. State of Maine*, 75 F.3d 716, 721 (1st Cir. 1996).

Where the burden of proof at trial would fall on the party seeking summary judgment, that party must support its motion with evidence—in the form of affidavits, admissions, depositions, answers to interrogatories, and the like—as to each essential element of its cause of action.  The evidence must be such as would permit the movant at trial to withstand a motion for directed verdict under Fed. R. Civ. P. 50(a).  *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Provided it does so, the burden then shifts to the opposing party to adduce evidence that establishes a genuine issue of material fact as to at least one essential element of the moving party's case.  The Court must view all evidence in the light most favorable to the nonmoving party and indulge all inferences favorable to that party.  *Daury v. Smith*, 842 F.2d 9, 11 (1st Cir. 1988).  The ultimate burden of proving the absence of a genuine issue of material fact remains at all times on the moving party.

Where the moving party would not bear the burden of proof at trial, the movant's initial burden is simply to demonstrate or point out a lack of evidence to support at least one essential element of the

17

opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  The burden then shifts to

the opposing party to adduce such evidence on each of the disputed elements as at trial would be

sufficient to withstand a motion for directed verdict.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250.

> **B.**     **Interpreting the Plan and the Confirmation Order**

By their complaint, the Plaintiffs have requested "an order instructing that the provision of the

CVR Agreement setting forth additional details regarding the thresholds above which CVR holders are

entitled to part of the proceeds from a covered transaction is a permissible implementation of [the Plan]

approved by the Court in [the Confirmation Order]."  The Confirmation Order provided for the execution

of an agreement between the reorganized debtor and the Second Lienholders that would govern the

Contingent Value Rights received by the Second Lienholders.  The Confirmation Order provided such

agreement shall be valid, binding, and enforceable without further action or approval by the Court.  The

Confirmation Order also required that any such agreement shall not "be inconsistent with the terms of

the Plan."  Accordingly, in order to adjudicate whether the Plaintiffs are entitled to the relief they

request, I must determine whether the payment threshold provisions of the CVR Agreement are or are

not "inconsistent with the terms of the Plan."

"A plan of reorganization is a binding contract between the debtor and the creditors and is

subject to the general rules of contract construction and interpretation."  *In re New Seabury Co. Ltd.

P'ship*, 450 F.3d 24, 33 (1st Cir. 2006), citing *In re Sergi*, 233 B.R. 586, 589 (1st Cir. 1999).  Principles of

state law govern the interpretation and construction of contractual provisions in bankruptcy.  *See U.S. v.

Butner*, 440 U.S. 48 (1980).  The Plan provides that the laws of the State of New York shall govern the

rights, obligations, construction, and implementation of the Plan and any agreements, documents,

instruments, or contracts executed or entered into in connection with the Plan.[46]  However, the

Confirmation Order states that the laws of the State of Rhode Island shall govern the rights, obligations,

---

[46] Plan at 4.

construction, and implementation of the Plan and any agreements, documents, instruments, or

contracts executed or entered into in connection with the Plan.[47]  The Confirmation Order also provides

that where and to the extent the Plan is inconsistent with the terms of the Confirmation Order, the

terms of the Confirmation Order shall control.[48]  However, both the Plaintiffs and the Defendants

concede that the laws of Rhode Island and New York are essentially the same as to the interpretation of

contracts[49] and both sides cite extensively to both Rhode Island and New York law.  Accordingly, while

Rhode Island's law of contract interpretation and construction controls, to the extent it aids in the

analysis, I will also consider New York law.

> C.    **Determining Ambiguity**

When construing a contractual provision, the Supreme Court of Rhode Island "has long held"

that the "primary objective is to ascertain the intent of the parties."  *Haffenreffer v. Haffenreffer*, 994

A.2d 1226, 1233 (R.I. 2010).  If the court finds that the terms of an agreement are clear and

unambiguous, the task of judicial construction is at an end and the agreement must be applied as

written.  *W.P. Associates v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I. 1994), citing *Aetna Casualty & Surety Co.*

*v. Graziano*, 587 A.2d 916, 917 (R.I. 1991).  The determination of the ambiguity of a contract is a

question of law.  *Westinghouse Broad. Co. v. Dial Media, Inc.*, 410 A.2d 986, 991 (R.I. 1980).  In

determining whether an agreement is clear and unambiguous, the document must be viewed in its

entirety and its language be given its plain, ordinary and usual meaning.  *W.P. Associates v. Forcier, Inc.*,

637 A.2d at 356, citing *Antone v. Vickers*, 610 A.2d 120, 123 (R.I. 1992).  An agreement is ambiguous only

when it is reasonably and clearly susceptible to more than one interpretation. *Gustafson v. Max Fish*

*Plumbing & Heating Co.*, 622 A.2d 450, 452 (R.I. 1993*); Nelson v. Ptaszek*, 505 A.2d 1141, 1143 (R.I.

---

[47] Confirmation Order at ¶ 106.
[48] *Id.* at ¶ 68.
[49] Plaintiffs' Memorandum in support of Plaintiffs' Motion for Summary Judgment, Docket No. 146-1 at 30, n. 9; Defendants' Opposition to the Plaintiffs' Motion for Summary Judgment, Docket No. 181-1 at 6, n.4.

1986).  Where no ambiguity is found, the intention of the parties must govern if that intention can be

clearly inferred from the writing and if it can be fairly carried out in a manner consistent with settled

rules of law.  *Westinghouse Broadcasting Co. v. Dial Media, Inc.*, 122 R.I. at 581.  However, even in

interpreting unambiguous contracts, the court will "consider the situation of the parties and the

accompanying circumstances at the time the contract was entered into, not for the purpose of

modifying or enlarging or curtailing its terms, but to aid in the interpretive process and to assist in

determining its meaning." *W.P. Associates v. Forcier, Inc.*, 637 A.2d at 356, quoting *Hill v. M.S. Alper &

Son, Inc.*, 106 R.I. 38, 47, 256 A.2d 10, 15 (R.I. 1969).

   As is often the case where the meaning of a contract is in dispute, both the Plaintiffs and the

Defendants in the instant case argue that the Plan and Confirmation Order unambiguously support their

respective positions that the CVR Agreement's payment threshold provisions are, as the case may be,

either consistent or inconsistent with the Plan.  For the reasons set forth below, I find that the Plan and

Confirmation are ambiguous as to this issue.

   I will first address the Defendants' argument that the Plan is unambiguously *inconsistent* with

the CVR Agreement's payment threshold provisions.  According to the Defendants, "[t]he plain and

unambiguous terms of the Plan do not provide for reductions in the CVR payment thresholds in the

event of a loan repayment or dividend."  The Defendants base this assertion on the fact that the Plan

clearly defines the types of transactions under which the CVR Holders are permitted to share the

proceeds and on the fact that the Plan contains no language addressing the effect of loan repayments,

dividends, or other distributions to the First Lienholders on the payment thresholds.  For the Plan to be

unambiguous in the Defendants' favor, the Defendants' interpretation must be the *only* interpretation

to which the Plan is reasonably susceptible.  *See Fryzel v. Domestic Credit Corp.*, 120 R.I. 92, 99, 385 A.2d

663, 667 (R.I. 1978); *Gustafson v. Max Fish Plumbing & Heating Co.*, 622 A.2d at 452.  While one

plausible interpretation of the lack of language regarding the impact of other distributions on the

payment thresholds is that the parties intended there to be no impact, it is certainly not the *only*

reasonable interpretation.  The Plan does not by its terms exclude counting additional distributions

toward the thresholds and the Confirmation Order contemplates that a further, and presumably more

detailed, document would be executed to fully document the deal reached by the parties.  Given these

circumstances, a reasonable factfinder could infer that among the additional details to be included in

the later document would be an explanation of the impact of additional distributions on the payment

thresholds.   In the absence of any Plan language addressing the issue of additional distributions to the

former First Lienholders and in light of the fact that the Confirmation Order contemplated a further

document setting forth the details of the parties' negotiated understanding, it is simply unclear from the

text of the Plan whether the CVR Agreement's payment threshold provisions constitute a material

modification of the Plan terms or just an explicit clarification of what was the clear but implicit

understanding of the negotiating parties.

       An examination of the context in which the Plan was negotiated also undercuts the argument

that the Plan and Confirmation Order are unambiguous in the Defendants' favor.  As the First Circuit has

explained, while "[t]he old-fashioned and still common" approach is that extrinsic evidence may only be

considered after a determination that contract language is ambiguous, this approach "should be taken

with a grain of salt, partly because extrinsic evidence may in fact reveal an ambiguity not otherwise

patent [. . .], but also because language may point only slightly in one direction and extrinsic evidence

strongly in another*." Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa*, 388 F.3d 15, 20 (1st Cir.

2004); *see also In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013)("[I]n analyzing contractual text, a

court need not turn a blind eye to context").

       The Rhode Island Supreme Court has also strayed from a strict bar on extrinsic evidence for

certain purposes as exemplified by its quoting with approval the following language from the seminal

case of *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561,

442 P.2d 641 (1968):

> We consider the following language from the opinion of Chief Justice Traynor of the
> Supreme Court of California in the *Pacific Gas* case to be particularly enlightening:
>
> "A rule that would limit the determination of the meaning of a written instrument to its
> four-corners merely because it seems to the court to be clear and unambiguous, would
> either deny the relevance of the intention of the parties or presuppose a degree of
> verbal precision and stability our language has not attained." *Pacific Gas,* 69 Cal.Rptr.
> 561, 442 P.2d at 644.
>
> *Haffenreffer v. Haffenreffer*, 994 A.2d at 1233 n. 12.

The Rhode Island Supreme Court has stated that it is appropriate to "consider the situation of

the parties and the accompanying circumstances at the time the contract was entered into, not for the

purpose of modifying or enlarging or curtailing its terms, but to aid in the interpretive process and to

assist in determining its meaning." *Haffenreffer v. Haffenreffer*, 994 A.2d at 1233, citing *Hill v. M.S. Alper*

*& Son, Inc.*, 106 R.I. 38, 256 A.2d 10 (1969).  In the instant case, a review of the situation of the parties

and the accompanying circumstances at the time the Plan was formed undermines the Defendants'

argument that the Plan unambiguously prohibits counting loan repayments, dividends, and additional

distributions to the First Lienholders toward the payment thresholds.

It is undisputed that, as of the petition date, the First Lienholders had a claim of approximately

$442 million while the Second Lienholders had a claim of approximately $155 million.  A valuation

analysis around that time estimated the reorganization value of Twin River to be $373 million.  The

Second Lienholders were completely out of the money at the time of negotiations.  Accordingly, in a

chapter 11 case, Twin River could "cram down" the Second Lienholders to a zero return.

Despite this seemingly bleak scenario, the Second Lienholders were not without considerable

leverage.  They could only be crammed down after the Debtor established its valuation in court,

meaning the Second Lienholders could threaten to wage a time-consuming and expensive valuation

fight.  Absent a settlement agreement, the Second Lienholders would have had little incentive not to

wage such a fight.  Additionally, the Second Lienholders might have been able to use the Intercreditor

Agreement to prevent any upside return to the First Lienholders above the value of their claim in the

event the reorganized debtor eventually underwent a financial upswing.  Finally, the Second Lienholders

were in a position, by virtue of the absolute priority rule, to prevent any return to general unsecured

creditors, thus potentially inhibiting the reorganized debtor from garnering some goodwill with its trade

creditors by providing a partial return in a plan of reorganization.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii).  All

this is to say that when the parties were negotiating the Plan, the Second Lienholders had both leverage

and incentive to wage a confirmation battle and therefore were in a position to bargain for *something*.

According to the Defendants, only a single transaction in the amount of $475 million or more

would require sharing with the CVR Holders, even if it means that more than $800 million will be paid to

the First Lienholders on account of their original $442 million claim.  Under this scenario, the First

Lienholders would be entitled to nearly a double par recovery before the Second Lienholders receive

anything.  Additionally, the First Lienholders could realize an even greater – and potentially unlimited –

recovery, so long as Twin River structures future transactions in pieces lower than the $475 million

threshold.  Further, under a reading of the Plan as the Defendants would have it, the First Lienholders

could receive unlimited dividends – theoretically billions of dollars – plus all the value of the $475 million

threshold while the Second Lienholders get nothing.  It appears under the Defendants' interpretation

that the Second Lienholders may have bargained for a wholly illusory return notwithstanding the

leverage they possessed when the Plan was negotiated and later confirmed.

The Plaintiffs ask the Court to find that the Defendants' interpretation produces absurd results

and, consequently, to find that the Plan is unambiguous in the Plaintiffs' favor.  I decline to take that

step.  I am not willing to go so far as to label the Defendants' interpretation as unambiguously absurd.

However, the possibility that the Defendants' interpretation creates a windfall for the First Lienholders

that appears to deviate from what any economically rational actor in the Second Lienholders' position

would have bargained for provides further support that the Plan is not unambiguous in the Defendants'

favor.  For these reasons, I reject the Defendants' argument that the Plan is unambiguously inconsistent

with the CVR Agreement's payment thresholds provisions.

Neither is the Plan unambiguous in the Plaintiffs' favor.  As discussed above, the Plan is silent on

the issue of how loan repayments and dividends paid to the First Lienholders will affect the payment

thresholds.  While the contextual analysis put forth by the Plaintiffs lends support to their

interpretation, the notable absence of language in the Plan discussing loan repayments and dividends

leaves even a reader who is familiar with the negotiating circumstances with a lack of clarity as to the

intent of the parties.  Accordingly, I reject the Plaintiffs' argument that the Plan is unambiguous and

consistent with the CVR Agreement's payment threshold provisions.

For the above reasons, I find the Plan and Confirmation Order to be ambiguous as to the

question of whether the CVR Agreement's payment threshold provisions are a permissible

implementation of the Plan.

D.    **Ascertaining the Intent of the Parties through Extrinsic Evidence**

Where a written agreement is ambiguous, the intent of the parties must be ascertained by

extrinsic evidence.  *Lennon v. MacGregor*, 423 A.2d 820, 822 (R.I. 1980), citing *Waterman v. Waterman*,

93 R.I. 344, 175 A.2d 291 (R.I. 1961); *Davis v. Manchester*, 17 R.I. 577, 23 A. 1016 (R.I. 1892).

Construction of an ambiguity in a contract is generally considered a question of fact that cannot be

resolved on summary judgment.  *Garden City Treatment Ctr., Inc. v. Coordinated Health Partners, Inc.*,

852 A.2d 535, 541 (R.I. 2004).  Such is the case when pleadings, discovery materials, and affidavits

indicate a dispute as to intent, thus revealing a genuine dispute as to a material fact.  *Lennon v.*

*MacGregor*, 423 A.2d at 822.  However, even if there is ambiguity in the language of a contract, the

evidence presented about the parties' intended meaning may be so one-sided that no reasonable

person could decide to the contrary.  *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban*

*Dev.*, 768 F.2d 5, 8 (1st Cir. 1985), citing *3 Corbin on Contracts* § 554 (1960).  In such a circumstance, the

judge takes the matter from the factfinder, instead deciding the factual question as one of law because

there is no genuine issue of material fact.  *Id.*  To the extent the moving party's case hinges on

ambiguous contract language, summary judgment may be granted if the ambiguities may be resolved

through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic

evidence that would support a resolution of these ambiguities in favor of the nonmoving party.  *Topps*

*Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *see O'Connor v. McKanna*, 116 R.I. 627, 634,

359 A.2d 350, 354 (R.I. 1976)(implying that summary judgment is only appropriate when a contract is

ambiguous if there is no genuine issue of material fact); *Lennon v. MacGregor*, 423 A.2d at 822

(summary judgment is not appropriate to resolve ambiguous contracts where the extrinsic evidence

indicates a genuine issue of material fact).

The Plaintiffs argue that the extrinsic evidence is so one-sided that there is no genuine dispute

as to the parties' intent, and, therefore, that they are entitled to summary judgment.  In contrast, the

Defendants have *not* argued that they are entitled to summary judgment on the basis that the extrinsic

evidence is one-sided in their favor.  However, the Defendants do argue that the extrinsic evidence

supports their own interpretation of the Plan and that the Plaintiffs have not met their burden of

demonstrating the lack of a genuine factual dispute.  Cognizant of the limited circumstances under

which summary judgment may be appropriate to resolve an ambiguous contract, I now proceed to an

examination of the extrinsic evidence offered by the parties.

The Plaintiffs have assembled considerable evidence supporting their position that the parties

on both sides of the negotiations intended for the Second Lienholders to share in the upside of the

restructured company once the First Lienholders were made whole on their pre-petition claims

regardless of the source of repayment.  This evidence supports the Plaintiffs' position that the economic

bargain that was struck by the negotiating parties prior to the bankruptcy and continuing through the case and confirmation is properly reflected in the payment threshold provisions of the CVR Agreement.

The Plaintiffs have marshalled deposition testimony and declarations sworn under penalty of perjury from parties on both sides of the negotiations.  On the First Lienholder side of the negotiations, the Plaintiffs have produced deposition testimony and/or declarations from Michael O'Brien, the lead professional for the First Lien Agent, Scott Greenburg of the First Lien Agent Counsel, and Peter Nurge, the lead professional for the First Lien Agent Financial Advisor.  On the Second Lienholder side, the Plaintiffs have produced deposition testimony from Jeffrey Robinson, the lead principal at Sankaty, advisor for the Sankaty Entities, and member of the Second Lienholder Steering Committee.  The Plaintiffs have also produced deposition testimony from Matthew Whiting, the lead partner for Lazard, Twin River's financial advisor.  The testimony and sworn declarations from the key representatives from *both sides of the negotiation* universally support the Plaintiffs' position regarding the intent of the parties.

Michael O'Brien, the lead professional for the First Lien Agent testified in his deposition that, "it was always my understanding that in any way, shape, or form, once the first lien lenders recouped $475 million, that from that point on, it – it would share according to the splits."[50]

Scott Greenburg of the First Lien Agent Counsel stated in his declaration that '[t]he parties always understood and intended that the Second Lienholders would begin to share in recoveries once the First Lienholders were paid in full on account of their pre-petition claim."[51]  He also testified in his deposition, speaking from the perspective of the professional negotiating on behalf of the First Lienholders, that, "I think the – the concept always was, or at least in the negotiations amongst us and the [Second Lienholders], was once we got, I'll say in bankruptcy-speak, par plus accrued and a little bit

---

[50] O'Brien Deposition, Coyle Ex. 4, Docket No. 148-4 at 152:21-24.
[51] Greenburg Declaration, Docket No. 150 at ¶ 8.

extra, again, I think there's like $30 million, if my math is right, then there would be a sharing

mechanism in the upside."[52]  Greenburg, counsel to the First Lien Agent, went on to testify that, "once

we received, you know, any form of cash, securities, et cetera, to get us back to our initial investment,

par plus accrued, and whatever the spread is on the extra, then there would be a sharing."[53]  This

testimony leaves little to quibble about and directly undermines the Defendants' position.

Peter Nurge, lead professional for the First Lien Financial Advisor, stated in his declaration that,

"[a]ll of the proposals made to the Second Lienholders were intended to offer them some upside

participation in Twin River once the First Lienholders were paid in full on their pre-petition claims."[54]

Nurge testified in his deposition that, "[t]here were ongoing negotiations about many things, but

whether – whether 475 million was an equity value number or it was the amount of proceeds that go to

the first lienholders before sharing starts under the contingent value right, that was never in dispute."[55]

On the Second Lienholder side, Jeffrey Robinson of Sankaty, testified in his deposition:

[t]he [$]475 [million] was very specifically constructed around the concept that after the
first lien achieves effectively an 8 percent premium over their crystallized claim, then
the second liens would start sharing in some of the ultimate proceeds. We did a fair
amount of work looking at precedents and understanding how various structures like
this had been done previously, that's what precedents are, and we determined that that
as an appropriate amount. And so that was a negotiated amount framed around the fact
that once the first lien lenders recovered post-emergence $475 million, then the second
liens would start participating.[56]

Robison further testified:

It was fully understood by everyone involved in the negotiation that there was a –
effectively a threshold after which the first lien claim recovers value and then the
second lien claim starts recovering value, and that the broad concept was all structured
around the – effectively an 8 percent premium to par of their fully loaded claims,
including hedges.[57]

---

[52] Greenburg Deposition, Coyle Ex. 1, Docket No. 148-2 at 33:15-21.
[53] *Id.* at 34:6-10.
[54] Nurge Declaration, Docket No. 154 at ¶ 4.
[55] Nurge Deposition, Coyle Ex. 5, Docket No. 148-5 at 110:20-25.
[56] Robinson Deposition, Coyle Ex. 3, Docket No. 148-3 at 107:12-24.
[57] *Id.* at 64:6-13 .

Matthew Whiting of Lazard, Twin River's financial advisor, testified that, "[t]he way that the [CVR] was structured, the spirit of it was that, once the first liens recovered at or around the amount that they were owed, the second liens would then begin to participate in the recovery."[58]

This testimony and the accompanying sworn declarations universally and unequivocally support the Plaintiffs' position as to the intent of the parties.  Notably, the Defendants were unable to produce any declarations or to highlight any deposition testimony that contradicts what appears to be the universal understanding of the negotiating parties.  The Defendants have argued that the Court should give no weight to the sworn declarations of the negotiating representatives because they amount to statements of the parties' previously unstated subjective intent.  The Defendants note that the unstated intent of a party to a contract is irrelevant.  What is relevant, and the reason that I do consider the declarations of the negotiating representatives, is the intent that the contracting parties objectively manifested.  I do not consider the declarations to contain statements of any party's previously unstated or unmanifested subjective intent.  As will be discussed, the Plaintiffs have produced ample evidence that the intent of the parties, to which the sworn declarations refer, was plainly expressed in communications between the negotiating parties.  The declarations refer to this objectively-expressed intent of the negotiating parties and are therefore relevant in analyzing the meaning of an ambiguous contract or, in this case, a plan and confirmation order.

In addition to the unequivocal testimony and declarations from those involved in the negotiations, the Plaintiffs have produced evidence that, throughout the course of negotiations, all the negotiating parties intended the deal to be as the Plaintiffs argue it to be with respect to the effect of additional payments or distributions on the payment thresholds.  This evidence demonstrates that the parties' understanding with regard to the effect of additional payments or distributions on the payment thresholds never changed from the time the original bargain was struck in the form of the Restructuring

---

[58] Whiting Deposition, Coyle Ex. 12, Docket No. 148-12 at 69:22-70:2.

Agreement, continuing to the bankruptcy filing, through the Plan formulation and the drafting of the

CVR Agreement, and finally through confirmation of the Plan.  Meanwhile, the Defendants have put

forth *no evidence* to contradict the Plaintiffs' view of the intent of the negotiating parties.

The Plaintiffs have produced multiple e-mails between the First Lien Agent professionals that

demonstrate that the early formulations of the deal provided a recovery to the Second Lienholders that

would be triggered after the First Lienholders reached a certain recovery threshold *that included*

repayment of any new debt issued to the First Lienholders.[59]  The Plaintiffs follow these initial e-mails

with e-mails from mid-June 2009 showing the crystallization of the deal that became the Restructuring

Agreement.  In an e-mail to other First Lien Agent professionals, Scott Greenburg of the First Lien Agent

Counsel describes the proposal from representatives of the Second Lienholders:

> Mike and I just spoke with Schwartzman/Robinson and they countered our 5% warrant
> offer.
> To be candid, I think Mike and I like the gist of the proposal and its something to work
> with.
> After Mike talked them down from an ask for 5% of common out of the box, their "real"
> proposal came to light.
> Which is- they want to share the ups
> in other words, once we recover our par claim (425 plus swaps)- they want the equity
> splits to go 20% to the firsts, and 80% to the seconds (only upon a monetizing event)
> ..........
> Basically they don't get anything until we are taken out at par and then they get the
> lions share of the upside.
> As i said to Mike, he can have 1/2 of every dollar i make over $5m (i.e.- this aint
> happening). High class problem if we ever had it.  Thoughts?[60]

Peter Nurge of the First Lien Agent Financial Advisor responds to Greenburg's e-mail stating:

> I think we'd have to work on the splits a little (80% seems high) and get a little
> consideration for the time value of our investment into the strike price (perhaps it
> accretes 10% of the value of our conversion a year), but overall, not an unexpected
> response.[61]

---

[59] May 18, 2009 E-mail from Peter Nurge, Coyle Ex. 13, Docket No. 148-13 ("If we do warrants, I've modeled them
at a strike price of $100 million of Equity {$450 less $350 debt}."); May 26, 2009 E-mail from Peter Nurge, Coyle Ex.
11, Docket No. 148-11 ("For the 2nds I've assumed we settle at 5% outright equity, and two series of 7.5%
warrants with exercise prices at $450 and $500 of Enterprise value net of $350 of retained debt.")
[60] June 15, 2009 E-mail from Scott Greenburg, Coyle Ex. 14, Docket No. 148-14.
[61] June 15, 2009 E-mail from Peter Nurge, Coyle Ex. 14, Docket No. 148-14.

The Plaintiffs next produce e-mails from the Second Lienholder side of negotiations days later revealing the understanding of the newly-formed deal to be that the Second Lienholders begin to share once the First Lienholders recover the value of their claim plus an 8% bump (*i.e.* $475 million).[62]  In a June 22, 2009 e-mail to various parties on the Second Lienholder side of negotiations, Jeffrey Robinson of Sankaty describes his understanding of the deal on the eve of Twin River's bankruptcy filing:

> Just a heads up that BLB/Twin River will most likely be filing this evening.  1st liens, 2nd liens (at least 47% of them), state and company have come to agreement in which the state will deliver $20MM in incremental EBITDA, 1st liens would own the equity and put $300MM of debt back on the company. 2nd Liens would get warrants that kick in once the 1sts get out whole and earn a 8% preference.[63]

As noted above, when asked in his deposition about his understanding of the Restructuring Agreement, which was completed around this time, Greenburg of the First Lien Agent Counsel testified, "I think the – the concept always was, or at least in the negotiations amongst us and the [Second Lienholders], was once we got, I'll say in bankruptcy-speak, par plus accrued and a little bit extra, again, I think there's like $30 million, if my math is right, then there would be a sharing mechanism in the upside."[64]

The Plaintiffs have put forth evidence to demonstrate that the deal remained the same in the course of the bankruptcy and as the Plan was drafted and distributed.  The First Plan described the second lien recovery using nearly the same language found in the Restructuring Agreement.  The Plan, itself, uses language that is substantially similar to the First Plan and the Restructuring Agreement.  When asked in his deposition about the deal at the time of the Plan formulation Michael O'Brien of the First Lien Agent testified as follows:

---

[62] June 17, 2009 E-mail Exchange between Jeffrey Robinson and Peter Schwartzman, Coyle Ex. 67, Docket No. 148-67; June 22, 2009 E-mail from Jeffrey Robinson, Docket No. 148-68.
[63] June 22, 2009 E-mail from Jeffrey Robinson, Coyle Ex. 68, Docket No. 148-68.
[64] Greenburg Deposition, Coyle Ex. 1, Docket No. 148-2 at 33:15-21.

Q. And at this point in time, was it your understanding that loan repayments that were going to be paid to the first lien holders count towards the payment thresholds set forth here in the plan?

A. Yes.

Q. And is the same true with respect to distributions to the first lien holders?

A. Yes.[65]

When asked during his deposition for his understanding of the economic deal reflected in the Plan's CVR description, Matthew Whiting of Lazard, Twin River's financial advisor, testified, "[m]y understanding was that the second liens would receive a contingent value right whereby, once the first liens had recovered at or near their claim amount, there was a mechanism by which the second liens would participate in any recovery above certain thresholds."[66]  When asked about the deal at the time the disclosure statement was sent out, Scott Greenburg of the First Lien Agent Counsel testified that his clients, the representatives of the First Lienholders, "who negotiated the deal understood that after they got par plus accrued, plus a small – I'll call it a tip, for lack of a better word, that there would be a sharing in any upside. Our clients understood that was just when they got paid back, for lack of a better word. [. . .] I think they understood that once they were repaid in full *from whatever sources*, that there would be a sharing in the upside with the second liens along the lines that are spelled out in the CVR Agreement."[67] (emphasis added).

The Plaintiffs have produced evidence that this understanding remained the same as the CVR Agreement was drafted and circulated.  The CVR Agreement was initially drafted in April 2010 by the First Lien Agent Counsel.  At the outset of the drafting of the CVR Agreement, in an e-mail exchange among professionals *representing the agent to the First Lienholders*, Peter Nurge explained the operation of the payment thresholds:

---

[65] O'Brien Deposition, Coyle Ex. 4, Docket No. 148-4 at 191:5-12.
[66] Whiting Deposition, Coyle Ex. 12, Docket No. 148-12 at 89:13-19.
[67] Greenburg Deposition, Coyle, Ex. 1, Docket No. 148-2 at 87:25-88:7, 88:22-89:2.

The CVR is supposed to kick in at the point that there is a sale or recapitalization of the company such that the senior secured lenders will have received more than $475 million of total value. million [sic] of that value will be from the secured note issued at emergence. *So the trigger should be a sale or recapitalization of the company such that the senior lender equity holders will cumulatively have received cash, notes and/or securities above $475 million.*[68] (emphasis added).

In a further e-mail in the same chain, Nurge explained that the New First Lien Loan issued to the First Lienholders counts toward the payment thresholds, stating, "the initial distribution of $300 million of notes counts towards the cumulative $475 [million payment threshold]."[69]  In subsequent drafts e-mailed among the professionals to the First Lien Agent, David Silverman of the First Lien Agent Counsel clarified that "any repayment of the unpaid principal of the [New First Lien Loan]" and "any distribution to Shareholders" count as "Transaction[s]," which under the definition of a "CVR Payment Event," cumulatively count toward the $475 million and $575 million thresholds.[70]

The Plaintiffs have produced evidence that this language regarding the effect of loan repayments and other distributions remained in the draft of the CVR Agreement circulated by the First Lien Agent professionals to the representatives of the Second Lienholders in late May 2010, prior to confirmation.[71]  Additionally, subsequent drafts produced prior to confirmation with input from the Second Lienholder representatives make explicit the understanding that dividend payments also count toward the payment thresholds.[72]  These drafts were circulated between the First Lien Agent's professionals and the representatives of the Second Lienholders in June 2010 in the weeks leading up to the Confirmation hearing.  At the Confirmation Hearing, counsel to Twin River informed the Court of the existence of the CVR Agreement which "incorporates at much greater length exactly how the operation

---

[68] April 14, 2010 E-mail from Peter Nurge, Coyle, Ex. 21, Docket No. 148-21.
[69] *Id.*
[70] April 26, 2010 E-mail form David Silverman, Coyle Ex. 23, Docket No. 148-23; April 27, 2010 E-mail from David Silverman, Docket No. 148-24.
[71] May 27, 2010 E-mail from Michael Cohen, Coyle Ex. 80, Docket No. 199-7.
[72] June 3, 2010 E-mail from Michael Cohen, Coyle Ex. 70, Docket No. 148-70; June 7, 2010 E-mail from David Silverman, Docket No. 148-71.

of the contingent value right works and what everyone's rights and obligations and enforcement under

that document are."  No party disagreed with this characterization of the CVR Agreement.  The Court

proceeded to confirm the Plan.

As detailed above, the Plaintiffs have offered sworn statements and deposition testimony from

representatives of both sides of the negotiations which universally support the Plaintiffs' position as to

the parties' intended meaning of the Plan.  Further, the Plaintiffs have put forth contemporaneous

documents and deposition testimony demonstrating that, throughout the course of negotiations, the

negotiating parties intended the deal to be what the Plaintiffs argue it to be.  The Plaintiffs have

submitted unrebutted testimony from the mouths of witnesses closely associated with the Defendants

that the deal was as the Plaintiffs argue it to be and that the deal never changed through confirmation.

In stark contrast, the Defendants have produced no additional witness testimony, depositions, or

declarations.  They are unable to produce any view from a negotiating party that disputes the view

advocated for by the Plaintiffs and proffered by the representatives of the negotiating parties under the

pains and penalties of perjury.  Instead, the Defendants ask the Court to ignore the declarations and

they offer alternative explanations as to what the contemporaneous documents and depositions

demonstrate.  I will now examine each of the Defendants' various attempts to use the extrinsic evidence

to demonstrate the existence of a genuine factual dispute.

The Defendants point to numerous contemporaneous documents and depositions to emphasize

the point that the Second Lienholders were "out of the money" based on the company's valuation at the

time of negotiations.  This point is not disputed and it does not change the analysis regarding the

parties' intent.  As discussed above, the Second Lienholders did have leverage with which to negotiate.

The fact that they were "out of the money" at the time of negotiations does not preclude the possibility

that the parties intended the Second Lienholders to share in the recovery and it does not, by itself,

create a genuine dispute as to any material fact.  "Out of the money" leverage is commonplace in

bankruptcy cases.

The Defendants cite to various depositions for the premise that the First Lienholders assumed

risk by taking equity in the Plan.  This notion is not in dispute either, and while it may provide some

ammunition with which the Defendants can counter the Plaintiffs' absurdity argument, an issue of

contract interpretation, it creates no genuine dispute as to any factual issue, most notably the question

of the parties' intent.

The Defendants also cite to numerous documents to demonstrate instances where the parties

discussed the CVRs, but did not discuss the issue of how loan repayments, dividends, or other

distributions might affect the payment thresholds.  The mere fact that the parties did not discuss the

effect of distributions to the First Lienholders in *every* communication regarding the CVRs does not

mean that the parties had not reached an agreement as to that issue.  The Plaintiffs have cited

numerous contemporaneous documents where the issue was discussed.  The additional documents

cited by the Defendants do not create a genuine dispute as to any material fact.  They merely show that

the parties at times had discussions about the CVRs that did not involve this specific issue.  This is no

surprise and it is irrelevant to the adjudication of summary judgment here.

Of all the various documents cited by the Defendants, they are only able to point to three

contemporaneous exchanges for the purpose of actually attempting to demonstrate that the intent of

the parties was counter to the one advocated by the Plaintiffs.  First, the Defendants cite to a December

2009 e-mail exchange between Peter Nurge of the First Lien Agent Financial Advisor and Michael Cohen

of the First Lien Agent Counsel discussing how best to describe the recovery of the Second Lienholders

in a press release about the Twin River Bankruptcy.  In the exchange, Nurge writes:

> Michael, I'm not liking the wording of the 2nd lien recovery. Remember that the
> legislators are focusing on a windfall down the road. I'd prefer to say that $155 million
> of 2nd lien lender debt will be written off and they will not receive any cash or equity
> ownership. If we must say something about the contingent value right, and I hope we

don't, perhaps we can say that they would receive contingent consideration in certain circumstances.[73]

Cohen responds, "I think you need to be straight about the CVR – will revise per your suggestion."[74]  Taking the evidence in the light most favorable to the Defendants, this exchange reveals a reluctance by the First Lien Agent Counsel to fully describe the CVRs in a press release about Twin River's bankruptcy.  As is illustrated by Cohen's response, it does not bear on the actual content of the CVRs or the parties' intent with respect to that content.  It does not raise a genuine factual dispute as to the intent of the parties.

Second, the Defendants point to an e-mail exchange between two representatives of the First Lien Agent, Michael O'Brien and Perry White.  The e-mail exchange contains a discussion about a First Lien Creditor referred to as "Highland" that did not vote in favor of the Plan.  In it, White explains Highland's rationale for not voting in favor of the Plan:

> I spoke to Highland on BLB. Primary issue is the priority of payment. They feel as though the 1st lien should get as much as possible and the 2nd lien should get zero. He also thought that the re-instatement of 75% of the 1st lien debt is setting the company up for failure going forward. Lastly they did not like the conditions precedent as it related to requiring RI gaming laws being amended.[75]

O'Brien responds to this e-mail stating:

> Company is getting an out-of-the-money contingent right if the Company is sold for in excess of $475MM, so not quite sure what that means, but your "color'' is greatly appreciated.[76]

In oral argument, the Defendants argued that this exchange demonstrates an understanding among the negotiating parties that the Second Lienholders "are not going to be receiving a recovery."[77]  Even read in the light most favorable to the Defendants, this exchange

---

[73] December 2009 E-mail, Tecce Exhibit 13, Docket No. 179-13.
[74] Id.
[75] March 2010 E-mail Exchange between White and O'Brien, Tecce Exhibit 14, Docket No. 179-14.
[76] Id.
[77] Summary Judgment Hearing Tr., Aug. 10, 2015, Vol. 1 at 111:10.

cannot be read for the premise that the parties understood the Second Lienholders would not

receive any recovery.  At best, it shows that the parties viewed the recovery to the Second

Lienholders as speculative based on the current value of the company and contingent upon

certain conditions being met.  Again, this exchange does not raise a genuine factual dispute as to

the parties' intent.

Finally, the Defendants produce correspondence from Octagon Credit Investors, LLC

("Octagon"), a Second Lienholder, to the First Lien Agent expressing Octagon's displeasure with

the proposed recovery to the Second Lienholders.  In a letter dated February 10, 2010 and

addressed to Michael O'Brien of the First Lien Agent, Octagon's principal, Gretchen Lam, stated:

> [W]e have several concerns regarding the Plan and the treatment of the second lien
> lenders thereunder. For instance, under the intercreditor agreement, the second lien
> lenders cannot receive any consideration until the first lien lenders are paid in full. Thus,
> after the first lien lenders are paid in full, the second lien lenders should receive all
> consideration thereafter until the Second Lien Facility is paid in full. However, the Plan
> provides otherwise. Under the Plan, the first lien lenders are to receive 50% and 25% of
> the consideration flowing from a potential transaction above $475,000,000 and
> $575,000,000, respectively-effectively sharing in the consideration that should be
> applied to the indebtedness under the Second Lien Facility. The proposed waterfall
> under the Plan patently violates, among other things, the intercreditor agreement. In
> order to comply with the intercreditor agreement, the first lien lenders should receive
> all consideration up to the amount of their debt--or $442 million--and the second lien
> lenders should receive all consideration above that amount until the Second Lien facility
> is satisfied in full. There should be no equity upside for the first lien lenders that is *pari
> passu* with the second lien lenders that effectively dilutes the second lien position.
>
> Moreover, under the Plan, the unsecured creditors are guaranteed a recovery of 65% of
> their claims. In contrast, the second lien lenders are not guaranteed any recovery under
> the Plan which may violate several provisions of the Bankruptcy Code relating to
> confirmability of plans.[78] (italics in original).

Gretchen Lam attached this letter to an e-mail she sent to O'Brien and others, including Scott

Greenburg of the First Lien Agent Counsel, on February 10, 2010.  In the e-mail, Lam states:

> In the Second Amended Disclosure Statement, it is clear that the rights and interests of
> the second lien lenders were not fairly addressed.  We are not supportive of the Plan.
> Specifically, the second lien lenders are given no certain recovery, while the (junior)

---

[78] Octagon Letter, Tecce Exhibit 24, Docket No. 179-24.

unsecured lenders have been awarded a 65% recovery.  Additionally, the second lien lenders are awarded their first dollar of recovery only after the realized firm value exceeds $475mm, a full 8% above the first lien lenders' claim.  Moreover, the second lien lenders only receive half of this value!  For example, if the firm value is $575mm, the first lien lenders would recover 119% of their claim, while the second lien lenders recover only 34%.  We believe this in violation of the bankruptcy agreement and bankruptcy code.[79] (underline in original).

In response to the Octagon e-mail, rather than addressing the substance of Octagon's correspondence, Scott Greenburg of the First Lien Agent Counsel informs Lam that she should contact counsel for the Second Lienholders, stating, "You should contact [T]om [K]reller of [M]illbank [T]weed who represents the second liens in the first instance and then we can all chat."[80]

At oral argument, the Defendants attempted to draw two inferences from the above exchange: (1) Octagon's characterization of the Plan in the letter and e-mail contradicts the Plaintiffs' interpretation, and (2) the failure of the First Lien Agent and its professionals to correct any errors in Octagon's characterization demonstrates their tacit agreement with the characterization.  Even read in the light most favorable to the Defendants, no reasonable factfinder could read this exchange in this fashion.

The letter and e-mail clearly indicate that Octagon was displeased with the Plan exactly as it has been interpreted by the Plaintiffs.  The Plaintiffs have argued for an interpretation of the Plan that provides that the First Lienholders and the Second Lienholders will share in the upside recovery after the First Lienholders have received their $442 million claim plus 8%.  This recovery over par to the First Lienholders before the Second Lienholders get anything is exactly what Octagon was complaining about.  The letter and e-mail make clear that Octagon took issue with any recovery to the First Lienholders that exceeded their original first lien claim before the

---

[79] Octagon E-mail, Tecce Exhibit 25, Docket No. 179-25.
[80] *Id.*

Second Lienholders could recover on their second lien claim, in part because such treatment might have violated the Intercreditor Agreement.  The hypothetical scenario set forth in Octagon's e-mail, in which the firm value is $575 million and the First Lienholders recover 119% of their claim, is consistent with the Plaintiffs' interpretation and directly contradicts the Defendants' interpretation.  In such a scenario, the First Lienholders would receive the first $475 million plus 50% of the remaining $100 million for a total recovery of $525 million which equals 119% of their original $442 million of claim.  Under the Defendants' interpretation, the First Lienholders could receive full repayment of the $300 million New First Lien Loan plus $50 million in dividends and would then still be entitled to receive the full $525 million for a total recovery of $875 million, nearly double their original claim *before the Second Lienholders would be entitled to any recovery.*  It is clear from the correspondence that even Octagon, a Second Lienholder dissatisfied with the possibility of the First Lienholders receiving even a small bump over par, did not envision the potential windfall to the First Lienholders now advocated for by the Defendants.

Moreover, I reject the Defendants' assertion that the First Lien Agent and its professionals tacitly accepted Octagon's characterization of the Plan by not responding to the substance of the correspondence.  Octagon sent its letter and e-mail to the First Lien Agent Counsel, among others.  Counsel then encouraged Octagon, a Second Lienholder, to contact counsel to the Second Lienholders rather than addressing the substance of the letter and e-mail. Such a response is warranted, if not mandated, by an attorney's ethical and professional responsibilities and no reasonable factfinder could draw the negative inference the Defendants suggest.  For the above reasons, I find that the Octagon correspondence raises no genuine dispute as to any issue of material fact, chiefly the parties' intent.  In fact, it further supports the Plaintiffs' position in this case.

Having reviewed the extrinsic evidence offered by the parties and cognizant of the limited

circumstances in which summary judgment is appropriate to determine the intent of the parties in light

of an ambiguous contract, I find that the extrinsic evidence, even when viewed in the light most

favorable to the Defendants, is so one-sided that no reasonable factfinder could resolve this matter in

favor of the Defendants.  There is no genuine dispute as to any material fact because the only

permissible interpretation of the one-sided extrinsic evidence is that the negotiating parties universally

understood the Plan to have a meaning that is consistent with the CVR Agreement's payment threshold

provisions.  The unequivocal and overwhelming evidence shows that the parties intended that, under

the Plan, the Second Lienholders / CVR Holders would begin to share in the recovery, upon the

occurrence of a monetizing event such as a sale or a transaction that, when combined with loan

repayments and other distributions, resulted in the First Lienholders / Shareholders recovering par plus

a small amount more (approximately 8%) on their pre-petition claims.  Now that the Defendants have

developed the "high class problem" of a very large return, it seems they have suddenly developed an

appetite for more than a "tip."  But that is not the deal they struck.  I find that the CVR Agreement's

payment threshold provisions are consistent with the Plan and are a permissible implementation of the

Plan.  The evidence that the CVR Agreement's payment threshold provisions memorialize the economic

agreement reached by the First Lienholders and the Second Lienholders, and embodied in the Plan, is

uncontroverted and compels granting the Plaintiffs' summary judgment motion.  Accordingly, the

Plaintiffs motion for summary judgment is granted on that basis.

      **E.**        **Defendants' Argument that the CVR Agreement Materially Modified the Plan**

The Defendants argue that the CVR Agreement, which was circulated for signature in September

2010 and fully executed in November 2010, constituted a post-confirmation (and pre-consummation)

material modification of the Plan because it altered the Plan's fundamental economics by changing the

thresholds after which the CVR Holders are entitled to a distribution.   After confirmation, but before

consummation, a plan may only be modified pursuant to section 1127 of the Bankruptcy Code, which

wraps in the disclosure and solicitation requirements of section 1125.  11 U.S.C. §§ 1127 and 1125.

Accordingly, the Defendants argue that the CVR Agreement is void because Twin River failed to comply

with the requirements of section 1127 when it materially modified the Plan.

As explained above, the payment threshold provisions of the CVR Agreement are consistent

with both the economics of the Plan and the intent of the parties that negotiated the Plan.  The parties

intended for loan repayments and dividends to the First Lienholders to count toward the payment

thresholds.  The Confirmation Order provided for the execution of a further agreement that would fully

detail the rights of the parties in a manner consistent with the Plan, and the Confirmation Order

provided that the further agreement would become binding without further Court action.  The payment

threshold provisions of the CVR Agreement did not trigger the requirements of section 1127 because

they clarified and implemented, rather than modified, the Plan.   Accordingly, the payment threshold

provisions of the CVR Agreement did not constitute material modifications of the Plan and the parties

were under no obligation to satisfy the section 1127 requirements.

For these reasons, I reject the Defendants' argument that the CVR Agreement's payment

threshold provisions materially modified the plan.

**F.      Defendants' Arguments that Twin River Should Have Amended the Plan Prior to
Confirmation and that Twin River Did Not Satisfy its Disclosure Obligations**

The Defendants next argue that the Plaintiffs failed to avail themselves of multiple opportunities

to amend the Plan, prior to confirmation, in order to incorporate some of the language from the CVR

Agreement.  The Defendants note that at least initial drafts of the CVR Agreement had been produced

prior to confirmation and could have been incorporated into the Plan by an amendment.  However,

mere opportunity to amend is not the same as an obligation to amend.  As I have found above, the

payment threshold provisions of the CVR Agreement are consistent with the Plan that was confirmed.

Just as Twin River had no post-confirmation obligation to modify the Plan under section 1127, it had no

pre-confirmation obligation to amend the Plan.

The Defendants also argue that Twin River did not meet its disclosure requirements under the

Bankruptcy Code.  Repeatedly at oral argument, the Defendants argued that even if the negotiating

parties did have a common understanding that the CVR payment thresholds would operate in a fashion

consistent with the CVR Agreement, this understanding was never communicated to all the First

Lienholders.  However, the uncontroverted evidence shows that not only were the First Lien Agent and

the First Lien Agent professionals aware of this understanding, but also that they bargained for and

accepted it.  Further, while the Defendants dispute that any common understanding was ever fully

disclosed to all of the First Lienholders, the uncontroverted evidence demonstrates that Twin River

complied with the Bankruptcy Code's disclosure requirements.

Section 1125(b) of the Bankruptcy Code provides that the solicitation of an acceptance or

rejection of a plan of reorganization from a holder of a claim or interest of a particular class must be

preceded or accompanied by "the plan or a summary of the plan, and a written disclosure statement

approved, after notice and a hearing, by the court as containing adequate information."  11 U.S.C. §

1125(b).  For purposes of section 1125(b), "adequate information" is defined as "information of a kind,

and in sufficient detail" to enable a hypothetical investor typical of the holders of claims in each voting

class "to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  In determining what

constitutes "adequate information" with respect to a solicited creditor of a particular class, the Court

must consider not just the disclosure statement itself, but also a hypothetical class member's "*ability to

obtain such information from sources other than the disclosure required by [Section 1125]*."  *See* 11

U.S.C. § 1125(a)(2)(C) (emphasis added); *see also In re New Power Co.*, 438 F.3d 1113, 1118 (11th Cir.

2006) ("It is presumed that such [hypothetical] investor will have the 'ability to obtain such information

from sources other than the disclosure required by this section as holders of claims or interests in such

class generally have.'"); *In re Bloomingdales Partners*, 155 B.R. 961, 972 (Bankr. N.D. Ill. 1993) (holding

that, "[d]epending on the level of sophistication among 'typical' holders in each 'relevant class,' the

required information for each relevant class may vary").

Even if the contents of the CVR Agreement and the universal understanding of the negotiating

parties with respect to the payment thresholds were not directly conveyed by Twin River to each First

Lienholder, Twin River still disclosed "adequate information" to satisfy its obligations under section

1125.  The undisputed facts show that the First Lienholders were sophisticated financial entities with

multiple experienced professionals representing their interests in the restructuring.  The Defendants do

not dispute that Twin River disclosed to the First Lienholders its intention to enter into a further

agreement with the Second Lienholders with respect to the CVRs.  The Defendants do not dispute that

the First Lien Agent had access to the CVR Agreement.  In fact, the Defendants do not dispute that the

professionals for the First Lien Agent *actually drafted the initial CVR Agreement*.  A hypothetical First

Lienholder typical of its class had the ability to easily obtain a copy of the CVR Agreement.  Such a

hypothetical entity could have merely asked *its own agent* for a copy, a request with which the First Lien

Agent could have easily complied because it helped draft the CVR Agreement and undisputedly had

access to it.  There has been no allegation and certainly no evidence that any actual First Lienholder was

ever refused such a request.  Twin River provided more than sufficient information for any of the highly

sophisticated and well-represented First Lienholders to easily obtain a full understanding of the deal for

which their own agent had bargained.  Twin River met its disclosure obligations under the Bankruptcy

Code.

For these reasons, I reject the Defendants' arguments that Twin River improperly failed to

amend the Plan or failed to meet its disclosure obligations.

      **G.**      **Plaintiffs' Argument that the Defendants' Conduct Prevents Them from Challenging
the CVR Agreement**

The Plaintiffs have argued that each of the three Defendants should be estopped from

challenging the validity of the CVR Agreement because of past conduct.  As I have found that the

Plaintiffs are entitled to summary judgment on an alternative basis, I decline to reach this issue.

**VI.**      **Conclusion**

For the reasons set forth above, the Plaintiffs' motion for summary judgment is granted and the

Defendants' motion for summary judgment is denied.  The Court will enter a separate judgment

granting the declaratory relief sought by the Plaintiffs.


Date:  November 3, 2015

                                          Frank J. Bailey

                                          United States Bankruptcy Judge